Overstock.com Overstock.com Our next case is number 2012-1629 Alcatel-Lucent, USA versus Overstock.com Thank you, Mr. Fleming. Good morning. May it please the Court, Mark Fleming with my partner, Lauren Fletcher, on behalf of Alcatel-Lucent, USA. With the Court's permission, I reserve three minutes of time for rebuttal. The judgment of invalidity should be reversed for several reasons, but the Court only needs to focus on one of them, and that is that the XLIB manual, which is the only prior art reference that is asserted for both anticipation and obviousness, does not disclose a terminal device that manages the actual positioning of objects on its display. The Court is familiar with that limitation from the previous decision in Lucent versus Gateway. What the XLIB manual discloses is one of the prior art old systems in which it was the host processor, not the terminal device, that managed the actual positioning of objects. Well, I mean, the trouble is that the manual is at least ambiguous about that, and you didn't put on an expert to say that, and you didn't cross-examine their expert on the subject, so why wasn't the jury entitled to read this and reach a different conclusion? I mean, there's a tendency in these cases to substitute lawyer argument for expert testimony, and that just doesn't work where you've got ambiguity. Judge Dyke, taking the second point first, with respect to what happened at trial, Dr. Nutt was cross-examined on this limitation. He was asked specifically about the actual positioning of objects in the XLIB manual reference, and he actually concedes on page 7109 of the appendix that the X Windows client, which is the host processor, specifies coordinates relative to the window being drawn, and he was directed on page 7107 to the portion of the manual, which appears on 10581 of the appendix, where it says most clients need to know the size of the screen so that the output can be tailored so that it looks the same or to look good on any display, and that is almost verbatim how the patent describes the prior art systems. If one looks at column 2, line 1 of the patent describing the prior art, what the patent says is the host needs to maintain precise knowledge of the display, especially the size of the display, in order to properly format the presentation of information to the user. Our expert did also testify to that. I don't understand why that's conclusive as to this claim limitation not being met. I mean, he concluded that the claim limitation was met, right? He did say that. He said it was the terminal device's job, but that by itself is an assertion that is not only not supported by anything in the manual, it is contradicted by the manual, and that is clear from three points, none of which is disputed on here. Did he say that was the terminal device's function, or did he say that the terminal device had the assistance of the host device in that respect? No, what he said on page 7087 of the appendix is that it's the terminal device's job. The assistance goes to a different claim requirement, which is the management of memory. But with respect to the positioning of objects, what he says is on 7087. I'll direct the report to that specifically. 7087. 7087. Beginning at line 5, it teaches us that with this windowing, with these nested windows, that the location on the physical display is determined, so the application program gets to have some input into the idea. So the host processor gets input, but then he continues and says, it says I'm thinking about such and such a sub-window, but I have no idea where it's at on the physical display, and that's the terminal device's job. That is the sum total of his testimony suggesting that the terminal device manages the actual positioning of windows, and that is contradicted expressly by page 10530 of the manual itself, where the manual says the screen layout or appearance and the style of user interaction with the system are left up to a separate program called the window manager, and the defendants concede on page 29 of their brief that the window manager runs on the client side, the host processor. That is plain if you go two pages on. It runs on both. It runs on both. They argue that it could run on the terminal device, but they point to nothing in the manual that says it runs on the terminal device. The only thing they point to is a statement that applications could execute locally, but the manual again is clear that the window manager is not an application. It says that on page 10533. All clients except the window manager are called applications. So it could be that you could take an application that the user is using, like a banking program or an online database, and execute that on a terminal device, but there is nothing in this manual that says that you could take the window manager, which the diagram of figure 1.3 specifically discloses as being on the client side and move it down to each of the terminal devices. Can you make this argument at trial? The argument that this limitation is not met certainly was made at trial. No, but this argument where you're talking about the window manager. The window manager was made in the Jamal brief, and the defendants did not argue waiver of that point, and this court made clear in clear value that in the Fifth Circuit, as long as it's made in the Jamal brief, that is sufficient to preserve the matter for appeal. But certainly in our expert's rebuttal report, he talked about the window manager, and when Dr. Donahue was directly examined, he was shown to a portion of the manual that refers to the window manager. He didn't use the specific words window manager, but certainly the argument as to the limitation was made at trial, and the argument as to the window manager specifically was made in the Jamal briefing repeatedly, in the opening brief and in the reply brief. So why isn't that part that you read ambiguous as to whether the terminal device plays a role in the positioning of objects? Which part are you referring to? I thought you were reading from 10-532. I pointed on 10-532 to the diagram, which is figure 1.3, which shows the host processor side on top where it says client, and then in the middle it says client, parenthesis, window manager, close parenthesis. But wait, on page 10-530, it says another important concept in X programming is that clients do not actually control such things such as where a window appears or what size it is. This is because multiple terminal devices must be able to display the information provided by the host processor. The host processor only gives hints about how long and where it would like the components to be displayed. So why isn't that support for the jury verdict? Because the reference needs to be read as a whole, and the immediately following sentence at the end of that very paragraph says the screen layout or appearance and the style of user interaction with the system are left up to a separate program called the window manager, and the defendants concede the window manager is disclosed in this reference as being on the client host processor side. I certainly agree that if all we had was the one sentence at the beginning of that paragraph, this would be a harder case. But the reference is read and considered as a whole. That's what I meant earlier about ambiguity. Even in your view, this passage seems to be saying two separate things, and the first part, in your view, is contradicted by the second part. No, I don't think that at all, Judge Dyke. Tell me how the first part of it, if you leave out the reference to the windows manager, I thought you just conceded that the first part of it would at least be a harder case for you. No, the point is that the first sentence is talking about a different type of program from the window manager, both of which are operating on the client side. Recall, you have client applications, which are the software that a person might actually use, like a banking program. Then you separately have a window manager, which manages the display of objects on the terminal device. Both of those are running on the client side, and that is shown immediately following in the diagram, and it's not disputed. So I would submit that the reference as a whole is in no way ambiguous about this. And let's point out, Dr. Nutt did not explain this to the jury. What's the first part saying? The first part is saying that client applications, the banking program or the online database, does not have ultimate control over where windows are positioned. That is up to the window manager, which is a separate program, but it is still operating on the client computer, the host processor. There is nothing in the manual and nothing in the testimony that suggests that the window manager could or should be moved down to the terminal device. The problem is there's no testimony that supports what you're saying either. You're saying, look at the manual here, and this is the only way to interpret it. Whereas on the face of it, it is at least seeming to be ambiguous. This is no different from what the court did in Motorola or in Fresenius, where there was a reference and an expert, in this case the analog to Dr. Nutt, saying, I believe this is satisfied. But when the court looks at the reference, the reference does not disclose the actual limitation that is supposedly contained in the prior art. I don't think it's any different from the analysis that would be performed there. Certainly in Motorola, there wasn't any evidence put on by the patentee as to that point, but this court did not view that as dispositive. This is an anticipation-obviousness case. The burden is on the challenger. And when one looks at this reference, particularly something like this that is somewhat complicated and not immediately accessible to a lay jury, at the very least there's an obligation, as the court said in Fresenius, to point out clearly to the jury where the supposed claim element is disclosed. Otherwise, the jury is thrown back on speculation or hindsight, which is not proper. And that is what happened in this case. Why didn't you provide an expert witness to testify about this? We certainly did. Dr. Donahue did testify about this limitation, that the exploit manual does not disclose the actual managing of the location of Windows on the terminal device. He says that. He says it on page 7126 of the appendix. He was shown a page from the direct report to that specifically. 7126, starting at line 12, trial counsel for Alcatel-Lucent USA, says if we could blow up 2.4.2, and 2.4.2 refers to 10558 in the manual. It's reprinted there. And that is a page that discusses the window manager. And Dr. Donahue says it's the ex-client, this is beginning at line 16 of the testimony on 7126, it's the ex-client that controls the positioning. That's what was identified as the host processor. And this is just talking about the Windows configuration and all of the characteristics and Windows attributes that are needed, that are needed by the ex-client to make decisions about how to move the eyeballs, that's the particular application he was discussing at trial. So that's really what it's describing. And how much control on positioning does it have on the next page? It being the ex-server, which is the terminal device, which was identified as the terminal device, question yes. Answer, it doesn't really control it. Again, I think of it as just like a projection. If you think back to the map that I described on the first day, the map is the thing that's kind of drawn at the ex-client, and then it's projected onto the ex-server, which was identified as the terminal device, and that terminal device doesn't have really any control. It's just being projected. So the expert did address this, most certainly. I would, with the court's permission, talk briefly about Claim 5, which has a different requirement from Claim 1. It's another independent claim, and it talks about a presentation data type, and that is different from the input object type that is disclosed in Claim 1. One way to think of it is sort of as concentric Venn diagrams, where you have an input object type, and then within that you have a smaller category of presentation data types that have to satisfy additional limitations. Specifically, they have to not contain methods or executable code, they have to not link to or be embedded in other presentation data types, and they have to have limitations on the kind of input capability that they have. And Dr. Nutt and the defendants do not point to anything suggesting that the ex-lib manual discloses anything like that. It's simply not there. So, regardless of what, you know, while I believe that there are plenty of arguments that sustain, that would call for reversing the judgment of invalidity, as to both claims, that's an independent argument we have on Claim 5. And we also have the claim construction argument that in the event that this court reverses on invalidity, as we believe it should, the claim construction construed the prosecution history disclaimer too broadly. There was a disclaimer, there's no dispute about that. But as this court did in Lucent v. Gateway, the prior case, and in Omega Engineering, it's important to look at the overall argument that the applicants were making in distinguishing the prior art. And they distinguished the Lewis site controller, which sat between the host processor and the terminal device, not just on the basis that it downloaded information and pushed it along, which is what the district court believed, but that it performed other functions as well, notably translating that information and adding its own message before sending a new packet along to the terminal device. So the prosecution history disclaimer was construed in a manner that disclaimed too much. We would submit that the judgment of invalidity should be reversed, the claim construction should be corrected, and the case remanded for a new trial on infringement. If the court has no further questions, I would reserve the time for rebuttal. Thank you, Mr. Klein. Thank you, Your Honor. Mr. Klein? Good morning, Your Honors, and may it please the Court. Addressing the description by Mr. Fleming of the prior art reference, I think what I'd like to focus on is that the prior art reference is not in any way consonant with that description. So, for example, at page A10549, one of the key things in the attributes, the window attributes, as to how you control it is, one of the choices is, should this window be allowed to be displayed, moved, or resized without notifying the window manager? That's the fifth or sixth bullet point down. It makes clear that the window manager does not even need to be participant in the display, moving, or resizing. Let's assume for the moment, hypothetically, that they're correct, that the window manager can't run on the terminal device. And they point to this paragraph on 10530 at the top, and they say that says that the object positioning is done by the window manager only. What's your response to that? Well, I mean, one is the point that I just made, that the window manager doesn't even have to be operating. They're giving it this total control. And I don't know if it was an assumption that you wanted me to make that the window manager can't be deployed at the terminal device? Yes, I want you to make that assumption. Okay. I mean, I think the statement that's at the last sentence isn't inconsistent. There are inferences. That's just the screen layout. Right. It is in no way stating, and cannot override, the very explicit statement that clients do not actually control such things as where a window appears or what size it is in. I mean, that's just unambiguous. And the, you know, Ms. Fleming relied on the definition. The definition is absolutely clear that the window manager is a client. That's A10533. So in your view of the language, the screen layout or appearance and the style of user interface, it does not include all aspects of positioning of the object? That's right. That's not the actual location of the object, because the first sentence makes it clear that what, I mean, it labels it the first sentence, important concept, and then it's definitive that the client do not actually control such things as where the window appears or what size it is. Definitive. And definitive also is, again, there's sort of a definition page that was relied on at A10533 where it makes clear that the window manager is a client. That's the third paragraph when it's defining client. So if the window manager is a client, at least as applied there, for the purposes of this paragraph. But the point is that the book is flexible. You don't even need a window manager for the location of the objects. That's what I started with. There's also the statement which was overlooked by counsel that the server controls the display. That's at A10539. That the server controls the display. Now remember, this is where you have that backward linguistics, so you always have to keep it. It's probably better to use the term X server. But at A10539, it says flat out that the server controls the display. Can you tell us where on that page? Yeah. You get that in front of me. It's the paragraph immediately above the figure. And then it's the sentence that says the end that controls the display and input device would name the server. Passive tense is the way it's written there. But it's there. And the point really is that Mr. Knott testified that it was the terminal's job. This is obviously a very flexible system. The whole point of the system is to be a distributed system. Before you do that, help me with one other sentence here. Of course. In the second paragraph under 10530, it says a window layout policy. Is that a window layout policy is referred to the windows manager, right? Window manager. I think that's something that, yes, I think that in this, it's a flexible system. But, yes, in this passage, that's what it means. So it says a window layout policy is a set of rules that specify allowable sizes and positions of windows and icons. So it sounds as though the window manager has something to do with the positioning of the windows and icons. You're exactly right, Your Honor. There's a priority scheme. So when you read through here and we'll work with Dr. Knott and he testified at trial, what you understand is there's a priority scheme where the application has input on where things are located, which makes sense. The window manager, when it's used, can create boundary conditions, create rules and policies that says, you know, thou shalt not have totally overlapping windows or whatever it may be. So it has something to do with the positions, but it doesn't, the set of rules doesn't cover all aspects. That's right. The ultimate determination is made at the server end, as it's stated there. The server controls the display. And that just, that makes sense also. Keep in mind that the displays are not these dumb terminals. There was clear testimony, this is important. There was clear testimony that in the X window, the terminal end is not dumb. And in fact, it's specified in here that they're Apple Macs, workstations, HP systems are these elaborate, extensive computers that obviously have input into what's shown. And there's no showing that there's all this information at the, what's called the client end or what we might think of as the host processor in the patent language, that there's this big information about every single terminal device that's doing all the mapping out, that there's no showing of that. In fact, you have essentially nothing. You have some vague testimony from their expert that just touches the subject, doesn't address any of these critical passages. Meanwhile, our experts have a point blank statement, and we get all the inferences. I mean, if Mr. Fleming had been serving as the expert down below, you know, the result might have been different, and we would have had different arguments and so on and so forth. That's not the way the trial played out. So, I think there's, I mean, the window manager doesn't even have to be used. It's a totally distributed system. So, the window manager can easily be at wherever you want it, because it says programs are at both ends. That's at 810539. And it's clear that it's a totally flexible system. And so, I think with all of that, there's plenty in here. We have very clear expert testimony. So, you know, a lengthy trial. They basically spent three questions or two questions with their expert on what now is more time spent on an appellate argument. I mean, they had five arguments already. They spent all their time on this one issue that their own expert spent two or three questions on, and their cross was one or two questions. So, yes, the coordinates are being provided. That was one of the questions. There is input by the window manager when it's running. No one can really deny that. But the priority scheme is very clear from the documentation. Regarding the claims five issue, let me turn to that, unless there's more questions on this point. This is presentation data type. This is another example of where there's putting so much effort and energy on appeal that they didn't put in a trial. And it's inappropriate. There is waiver here. We made the waiver argument, an oral argument below on the JML. The situation is that the infringement theory was that drop-down menus, text boxes, and radio buttons are presentation data types. That was the infringement theory. And their expert said those types of objects satisfy both input objects and presentation data types. They won't deny that. That's at A6319. They said it satisfies presentation data types. Our expert said that these input objects exist and then also presentation data types exist and that Don Ho agrees that when you have drop-down menus, text boxes, and radio buttons, meet the definition of presentation data types. Seems to me that's more than adequate. You have both experts agreeing that those types of objects can meet the requirements of presentation data types. What more do you need? On appeal, of course, they lost on infringement so they can flush that argument. And now they're saying there's a difference between a menu or drop-down menu or text box. I think the argument is that somehow our drop-down menus are different. An argument not made at trial. First of all, they didn't make this argument at all because of their infringement theory. They didn't want attention. They didn't make it. This has been the whole style of the appeal. They didn't make it in opening statement. They didn't make it in closing argument. They didn't make it through their expert. They didn't cross-examine our expert. They didn't put it in their 50A motion. And if there's any case for waiver, how are we on notice that they're going to make a distinction of something that their own expert is embracing, which is that presentation data types are satisfied by drop-down menus and text boxes. And that was portrayed as the second strongest argument they have on appeal. There's no questions on that. The last point was on the claims obstruction issue. I just think a review of the prosecution history leads to the same conclusion that all the other judges that have reached this, four different judges, that the distinction was not on whether the intermediate processor was involved in some type of management. In fact, the patent doesn't even describe whether there's management or not in an intermediate processor. I mean, it's just a distinction made of whole cloth. They couldn't have made that argument in prosecution. It wasn't made in the prosecution. It's not supported in the patent. And all the judges that have looked at this have concluded that this active management concept is a fiction. We're right. Because there is no such thing. What they do is they cobble together things such as that the information comes to the processor and then it moves it along. That's not active management. It's a very, very thin argument. And I think, you know, I know cyber is being reconsidered now, whether you apply cyber or just use common sense. The fact that so many district judges have rejected the attempt to avoid the disclaimer is sufficient alone. If there's nothing else. Okay. All right. Thank you kindly. Mr. Vlamin. Thank you, Your Honor. I have just four points to make briefly in response. The first, there is a showing in the record at trial that the host processor needs to know the layout of the terminal device display in the XLIB manual. That's on page 7107, where Dr. Nutt is being crossed on this very limitation. And trial counsel points him, asks him, if you could, this is line 13 of 7107, if you could, this is called 3.204. Citing material reprinted on page, I believe it's 531 of the appendix. Getting Windows information. If you could read that first sentence for the ladies and gentlemen of the jury. Answer. Most clients need to know the size of the screen so that the output can be tailored to look the same or to look good on any display. That argument was made at trial. This is the point. Why is layout necessarily an exclusive description for positioning? Well, okay, this is the second point I was going to make, Judge Dike, is that even if there are some rules that the window manager does not play, there is no suggestion at either trial or in the book that the additional work is done by the terminal device. Rather, the passage indicates that it is the client application that determines the coordinates of what happens inside the window. And Dr. Nutt admitted that on cross-examination, that it is the application, the host processor. And that's on page 7109. It's the application that will determine whatever is not laid out by the window manager. And the passage that Mr. Reines read simply said, is it possible to move it or resize it without consulting the window manager? Fine. If it is, it's still the client application that's doing it. We're talking about two separate programs, both of which are running on the host processor client machine. There is no suggestion that the terminal device does any of this. If there is a division of labor, which I will readily agree there can be, it is between the client application, the substantive program, and the window manager, both of which are in the host processor. Okay. Thank you, Mr. Fine. Thank you, Your Honor. Thank both counsel. The case is submitted.